**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**AMIRA GONZALEZ BOISSON,**

**Plaintiff,**

**v.**

**MICHAEL R. POMPEO, Secretary, U.S.**
**Department of State, in his official capacity,**

**Defendant.**

---

**Civil No. 19-2105 (JDB)**

## MEMORANDUM OPINION

In 2019, the State Department revoked plaintiff Amira Gonzalez Boisson's U.S. passport, citing a newly discovered irregularity in a document submitted in support of her passport application that called into question whether she is a U.S. citizen. Gonzalez Boisson brought this action against the Secretary of State ("the government") under the Administrative Procedure Act ("APA") and the U.S. Constitution, seeking from the Court (1) a declaration that she is a citizen and national of the United States; and (2) declarations that the government's pre- and post-revocation procedures violated the Due Process Clause of the Fifth Amendment. Now before the Court is the government's motion to dismiss. For the reasons stated below, the Court will grant the motion as to the Due Process Clause claim but deny it as to the APA claim.

### Background

In 1970, when Gonzalez Boisson was born,[1] U.S. immigration and nationality law provided that persons born outside of the United States to one U.S. citizen parent and one foreign national parent are themselves citizens of the United States if, prior to their birth, the U.S. citizen parent

---

[1] "Citizenship of a person born abroad is determined by law in effect at the time of birth." Hizam v. Kerry, 747 F.3d 102, 105 (2d Cir. 2014); see also Sessions v. Morales-Santana, 137 S. Ct. 1678, 1686–87 & n.2 (2017) (same).

"was physically present in the United States . . . for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years." 8 U.S.C. § 1401(a)(7) (1970). Gonzalez Boisson claims to be a citizen under this provision, through her U.S. citizen mother, Denise Boisson ("Denise").

According to the allegations in Gonzalez Boisson's complaint, which the Court must assume to be true for purposes of a motion to dismiss, Denise was born in the United States on May 20, 1946, in San Diego, California, and is therefore a U.S. citizen. Compl. for Declaratory Relief ("Compl.") [ECF No. 1] ¶ 7; Ex. 1 to Mot. to Dismiss ("Revocation Letter") [ECF No. 12-2], at 1. Denise resided in San Diego until she was seven, when she moved to Mexico. Compl. ¶ 8. She remained there for several years, eventually returning to the United States in August 1959, at age thirteen. Id. ¶¶ 8–9. She then lived in San Diego for six years, until the summer of 1965, when she married a Mexican citizen and moved back to Mexico. Id. ¶ 12. Between 1965 and 1970, Denise visited family in San Diego for two months each summer, except in 1966, when she visited for only one month. Id. ¶¶ 13–15. On October 16, 1970, in Mexico, Denise gave birth to plaintiff Gonzalez Boisson. Id. ¶¶ 5, 18. The complaint alleges that, by that date, Denise had resided in the United States for a cumulative period of at least ten years, five of which were after she turned fourteen. Id. ¶ 18.

Gonzalez Boisson currently lives in Mexico, and indeed has "lived [her] entire life" there. Decl. of Amira Gonzalez Boisson, Ex. A to Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss [ECF No. 15-1], ¶ 2. In 2013, she applied for a U.S. passport. See Compl. ¶ 18. In support of that application, she submitted a signed statement from Denise "attesting to [Denise's] physical presence in the United States." Revocation Letter at 1. Specifically, Denise's statement attested that she was "physically present in San Diego, California from May 20, 1946 to August 10, 1959."

Id. at 2.  Based on her application and supporting materials, Gonzalez Boisson was issued a U.S. passport on September 23, 2013.  Compl. ¶ 18.

Several years later, on May 6, 2019, the government revoked Gonzalez Boisson's passport. Id. ¶ 20.  In its revocation letter, the government stated that a subsequent investigation had revealed an inconsistency between Denise's 2013 statement in support of Gonzalez Boisson's passport application and a statement in Denise's own 2003 passport application, where she had attested that she "resided and went to school in Ensenada, Mexico from 1950 to 1958."  Revocation Letter at 2.  Relying on both this inconsistency and the totality of the evidence before it, the government determined that Denise had "accumulated at most four years of physical presence in the United States" prior to Gonzalez Boisson's birth.  Id.  Accordingly, the government concluded that Denise could not have transmitted U.S. citizenship to Gonzalez Boisson and revoked Gonzalez Boisson's passport.  Id.  The revocation letter stated that Gonzalez Boisson had "a right to a hearing" to "address the basis upon which the [government] revoked the passport," which she could request within 60 days, and that she could also reapply for a passport if she could "present additional evidence supporting a lawful claim to U.S. citizenship."  Id.

Following the revocation of her passport, Gonzalez Boisson filed this action, seeking declarations that she is a U.S. citizen and that the government's revocation procedures were unlawful.  Compl. at 6.  The government has since moved to dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6), arguing that the Court lacks jurisdiction over Gonzalez Boisson's APA claims and that its revocation procedures were lawful.  See Mem. of P & A in Supp. of Def.'s Mot. to Dismiss ("MTD") [ECF No. 12-1] at 7–14.  The motion is now fully briefed and ripe for decision.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) for failure to state a claim "tests the legal sufficiency of a complaint." Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible when the factual content allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. Id. "While a court generally does not consider matters beyond the pleadings" on a 12(b)(6) motion, the court "may consider 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]'" Bepler v. Vorobek, 2020 WL 1821110, at *2 (D.D.C. Apr. 10, 2020) (quoting Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011)); see also EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.").

In considering a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, a court must similarly accept the factual allegations in the complaint as true. See Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The court is, however, permitted to consider materials outside the pleadings to determine whether it has jurisdiction. Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000). Additionally, "[b]ecause Rule

12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)."  Schmidt v. U.S. Capitol Police Bd., 826 F. Supp. 2d 59, 65 (D.D.C. 2011).

## Discussion

### I.   Gonzalez Boisson's APA Claim

Gonzalez Boisson first asserts a claim against the government under the APA, alleging that the revocation of her passport was unlawful under 5 U.S.C. § 706(2) and seeking a declaration that she is in fact a U.S. citizen.  Compl. ¶¶ 22–24.  The government argues that she cannot seek relief under the APA because "an adequate alternative [remedy] is available to her" through the procedures in 8 U.S.C. § 1503.  MTD at 7–8.  The Court disagrees with the government and will allow Gonzalez Boisson's APA claim to move forward.

The APA allows "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," to seek review of that agency action in federal court. 5 U.S.C. § 702.  The types of agency action for which a person can seek judicial review are, however, limited by 5 U.S.C. § 704: as applicable here, only "final agency action for which there is no other adequate remedy in a court" is reviewable.[2]  Section 704 "reflects Congress'[s] judgment that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'"  Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice ("CREW"), 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting Bowen

---

[2] The government does not appear to dispute that the revocation of Gonzalez Boisson's passport was "final agency action," nor could it, given the Supreme Court's conclusion under similar circumstances in Rusk v. Cort, 369 U.S. 367 (1962), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977), that a decision on a passport application was a "final administrative determination," id. at 372.

v. Massachusetts, 487 U.S. 879, 903 (1988)).  The Supreme Court has cautioned that § 704 should not be construed to "defeat the central purpose [of the APA] of providing a broad spectrum of judicial review of agency action," Bowen, 487 U.S. at 903, and should instead be given a "hospitable interpretation," Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967) (internal quotation marks omitted).

Several broad principles guide a court's assessment whether an alternative remedy is "adequate."  First, although an alternative remedy "need not provide relief identical to relief under the APA," the relief must nevertheless be of the "same genre"; "doubtful and limited relief" will not suffice.  Garcia v. Vilsack, 563 F.3d 519, 522 (D.C. Cir. 2009) (quotation omitted).  Second, an alternative is not adequate where it requires a person to undergo an "arduous, expensive, and long" process, particularly one that "carr[ies] the risk of serious criminal and civil penalties." U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. 1807, 1815 (2016) (internal quotation marks omitted).  Third, the alternative remedy must actually result in a determination of the underlying legal question, rather than a peripheral issue.  See id. at 1815–16 (rejecting alternative remedy as inadequate where it had "pertinence" only to a peripheral issue and had no bearing on the underlying legal question).  And fourth, in order to deem something an adequate remedy, a court must find "clear and convincing evidence of legislative intent to create a special, alternative remedy and thereby bar APA review."  CREW, 846 F.3d at 1244 (internal quotation marks omitted).

The government's position is that the procedures at 8 U.S.C. § 1503(b) and (c) satisfy all these requirements and therefore constitute an adequate alternative remedy to this suit, in which Gonzalez Boisson seeks review of the government's revocation of her passport based on its

conclusion that she is not a U.S. citizen.  See MTD at 7–8.  To analyze this argument, the Court begins by describing the procedures in § 1503.

By its terms, § 1503 establishes two paths by which a person denied "a right or privilege as a national of the United States" on the ground that he or she is not, in fact, a national of the United States "may" challenge that denial.  8 U.S.C. § 1503(a), (b), (c).  The first path is available only to persons "within the United States," and allows such persons to initiate a declaratory judgment action against the government in federal court.  Id. § 1503(a).  The second path is available to persons outside the United States, like Gonzalez Boisson, and is considerably more complicated and onerous than the first.  An aggrieved person outside the United States must begin by applying to "a diplomatic or consular officer of the United States" for a "certificate of identity." Id. § 1503(b).  A certificate of identity enables a person to "travel to the United States to apply for admission."  22 C.F.R. § 50.11.  If the diplomatic or consular officer is satisfied that the application is "made in good faith and has a substantial basis," the officer "shall issue" the certificate of identity.  8 U.S.C. § 1503(b).  On the other hand, if the officer denies the application, the aggrieved person may appeal such denial to the Secretary of State.  Id.  Armed with a certificate of identity, an aggrieved person may then travel to a port of entry to the United States and apply to the Attorney General for admission, subject to "all the provisions [of the Immigration and Nationality Act] relating to the conduct of proceedings involving aliens seeking admission to the United States." Id. § 1503(c).  If granted admission, the aggrieved person may then take advantage of § 1503(a) and initiate a declaratory judgment action against the government "for a judgment declaring him to be a national of the United States."  Id. § 1503(a).  If denied admission, the exclusive remedy for the aggrieved person is to challenge that denial in a habeas corpus proceeding.  Id. § 1503(c).

In evaluating how § 1503 and the APA interact, this Court does not write on a blank slate. Almost sixty years ago, the Supreme Court in Rusk v. Cort addressed a nearly identical question: whether "the procedures specified in [§1503(b) and (c)] provide the only method of reviewing the Secretary of State's [citizenship] determination."   369 U.S. 367, 375 (1962).   Like Gonzalez Boisson, the plaintiff in Cort was seeking a "judgment declaring him to be a citizen of the United States" under the APA following the denial of his passport on the grounds that he was not a U.S. citizen (although in his case, the government had denied his initial passport application, rather than revoking his passport, as in the instant case).   See Cort v. Hester, 187 F. Supp. 683, 684 (D.D.C. 1960).   After analyzing the text, legislative history, and purpose of § 1503, the Court held "that a person outside the United States who has been denied a right of citizenship is not confined to the procedures prescribed by [§ 1503(b) and (c)], and that the remedy pursued in the present case [(i.e., APA review)] was an appropriate one."   Cort, 369 U.S. at 379.

In so holding, the Court emphasized that the language of § 1503 is permissive, rather than mandatory, providing that aggrieved persons "may" apply for a certificate of identity and admission to the United States; the language thus "shows no intention to provide an exclusive remedy" or to "den[y] existing remedies" like APA review.   Id. at 375–76 (quotation omitted). The Court also highlighted portions of the statute's legislative history indicating that the creation of the dual-path framework was designed to prevent abuse of § 1503's predecessor statute.   The Court explained that prior to the enactment of § 1503, U.S. law permitted aliens to enter the United States, then initiate an action in court to establish their citizenship.   Id. 377–78.   Some aliens took advantage of this system to gain entry into the United States and then "disappear into the general populace."   Id.   According to the Court's examination of the legislative history, § 1503(b) and (c) were intended to address these abuses and to "limit the easy-entry provision"—their purpose was

not "to foreclose lawsuits by claimants . . . who do not try to gain entry to the United States before prevailing in their claims to citizenship." Id. 378–79. In other words, the Court found in § 1503(b) and (c) no "clear and convincing evidence of legislative intent to create a special, alternative remedy and thereby bar APA review." CREW, 846 F.3d at 1244 (internal quotation marks omitted).

Cort, therefore, poses a formidable obstacle to the government's argument that § 1503(b) and (c) foreclose APA review. Another court in this district recently held that Cort is controlling in these circumstances and concluded that § 1503(b) and (c) are not an adequate alternative remedy to an APA action. See Chacoty v. Pompeo, 392 F. Supp. 3d 1, 9 (D.D.C. 2019). But the government is undeterred, offering several reasons why Cort does not control here.[3] None of them are persuasive.

First, the government contends that Cort is no longer good law, citing the Supreme Court's subsequent decision in Califano v. Sanders, 430 U.S. 99 (1977). See MTD at 11–12. But all Califano did, as relevant here, was hold that the APA is not "an independent grant of subject-matter jurisdiction." Califano, 430 U.S. at 105. The Califano Court noted that Cort (along with two other Supreme Court decisions) had "arguably . . . assumed, with little discussion," that the APA did independently grant subject matter jurisdiction. Id. It therefore abrogated that aspect of Cort. In no way, however, did Califano raise any doubts about any other aspects of Cort's analysis, including its assessment of § 1503. Indeed, the D.C. Circuit has continued to rely on Cort for its § 1503 analysis following the issuance of Califano. See, e.g., Rafeedie v. Immigration & Naturalization Serv., 880 F.2d 506, 511 (D.C. Cir. 1989) (citing Cort and reiterating that § 1503

---

[3] As support for its arguments, the government repeatedly cites another recent decision, Hinojosa v. Horn, 896 F.3d 305 (5th Cir. 2018), in which a divided panel of the Fifth Circuit concluded that § 1503(b) and (c) are an adequate alternative remedy to an APA action, id. at 313–14. This Court respectfully disagrees with the Hinojosa majority's reasoning and instead agrees with the dissent, for the reasons outlined in this opinion.

does not foreclose claims under the APA).  Here, Gonzalez Boisson invokes federal question jurisdiction under 28 U.S.C. § 1331 as the basis for subject matter jurisdiction, not the APA. Compl. ¶ 1.  <u>Califano</u> thus has no bearing on this case.

Next, the government argues that <u>Cort</u> did not address the specific question whether § 1503(b) and (c) constitute an "adequate alternative remedy" under § 704 of the APA.  <u>See</u> Reply in Supp. of Def.'s Mot. to Dismiss ("Reply") [ECF No. 18] at 3 (citing <u>Hinojosa</u>, 896 F.3d at 313). However, <u>Cort</u> did analyze § 1503(b) and (c) under a very similar provision of the APA, § 703, which provided (at the time) that "[a]gency action shall be subject to judicial review . . . except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law." <u>Cort</u>, 369 U.S. at 372 (quotation omitted).  The Court cannot see, and the government does not explain, why the "adequacy" analysis would be fundamentally different under former § 703 than under § 704.  And, in any case, as the <u>Chacoty</u> court noted, <u>Cort</u> ultimately "applied—almost word-for-word—the same test that governs for purposes of 5 U.S.C. § 704."  <u>Chacoty</u>, 392 F. Supp. 3d at 10.

The government further argues that the plaintiff in <u>Cort</u> was in a very different position from Gonzalez Boisson, and that this Court should distinguish <u>Cort</u> on that ground.  Specifically, the government points out that the plaintiff in <u>Cort</u> was under indictment in the United States and "would have faced criminal detention and prosecution" had he attempted to use the procedures at § 1503(b) and (c).  MTD at 10.  In the government's view, this fact was essential to the Court's conclusion in <u>Cort</u>.  But <u>Cort</u> itself supports no such inference.  Only a single line in <u>Cort</u>'s analysis even mentions the potential criminal penalties at play, questioning whether "Congress intended that a native of this country living abroad must travel thousands of miles, be arrested, and go to

jail in order to attack an administrative finding that he is not a citizen of the United States."[4]  Cort, 369 U.S. at 375.  The rest of the analysis, including the Court's ultimate holding, was framed more broadly and suggests that the particulars of the Cort plaintiff's situation were not of much significance: "we hold that a person outside the United States who has been denied a right of citizenship is not confined to the procedures prescribed by [§ 1503]."  Id. at 379.

Moreover, even if the risk of detention and other penalties were important to Cort's analysis, that would weigh in Gonzalez Boisson's favor.  To avail herself of § 1503(b) and (c), she would have to endure "an arduous, expensive, and long" process that would expose her to the risk of "serious . . . civil penalties."  Hawkes Co., 136 S. Ct. at 1815.  She would first have to bear the expense and burden of traveling to a U.S. port of entry.  Once there, she would face the prospect of intrusive inspection, detention, and removal.  See 8 U.S.C. § 2215 (providing for inspection, detention, and removal of persons applying for admission).  And there is no telling how long her admission proceedings would take.  Gonzalez Boisson fears these risks: she has filed a declaration with the Court stating that she "fear[s] being detained because [she has] a family," four children (three of whom are school-aged), and a demanding job that "does not permit [her] to be absent for long periods of time."  Gonzalez Boisson Decl. ¶¶ 5–6.  It is true, as far as it goes, that Gonzalez Boisson would not face "arrest and criminal penalties in light of pending charges," Reply at 2, as the plaintiff in Cort did, but the Court is not persuaded that the risks she would face are all that much less serious.

---

[4] The government attempts to draw a further distinction between Cort and the instant case: there, the plaintiff was a native-born U.S. citizen, and here, Gonzalez Boisson alleges that she is a foreign-born U.S. citizen who received her citizenship from her U.S. citizen mother.  MTD at 10–11; Reply at 3 (citing Hinojosa, 896 F.3d at 313).  Aside from the single line just quoted, however, this Court can find no indication that the fact that the Cort plaintiff was a native-born citizen had any bearing on the Supreme Court's analysis whatsoever.  Nor does anything in § 1503 suggest a distinction between persons based on how they received their U.S. citizenship.  The Court therefore rejects this distinction as irrelevant.

Lastly, the government contends that § 1503(b) and (c) should be deemed an adequate remedy because no matter what happens under those procedures, "all roads lead to judicial review concerning Gonzalez Boisson's claim of citizenship." MTD at 8. Not so. All roads might lead to judicial review, but not all of them lead to review of Gonzalez Boisson's <u>citizenship</u>. If she is denied a certificate of identity by the diplomatic or consular officer and then finally by the Secretary of State under § 1503(b), she would be entitled to seek review of that decision in federal court. But that review would be of the decision to deny her a certificate of identity—not of her citizenship. <u>See</u> 8 U.S.C. § 1503(b) (entitling an applicant to certificate of identity if "application is made in good faith and has a substantial basis"). Similarly, if she is denied admission to the United States by the Attorney General under § 1503(c), she would be entitled to seek review of that decision in habeas corpus proceedings. But, again, that review would be of the decision to deny her admission—not of her citizenship. <u>See id.</u> § 1503(c) (providing that the Attorney General makes the "final determination" whether a person is "entitled to admission" to the United States). In either circumstance, if the reviewing court determines that the Secretary of State's or Attorney General's denial was proper, that determination would be conclusive, and no court would ever have considered Gonzalez Boisson's citizenship itself. As a result, § 1503(b) and (c) offer her only "doubtful and limited relief," <u>Garcia</u>, 563 F.3d at 522, that might well never result in a determination of the underlying legal question: is she a citizen?

For all these reasons, the Court concludes that the procedures outlined in § 1503(b) and (c) are not an adequate alternative remedy to Gonzalez Boisson's APA claim. Hence, the government's motion to dismiss that claim will be denied.

## II.      Gonzalez Boisson's Due Process Clause Claim

Separate and apart from her APA claim seeking a declaration that she is a citizen, Gonzalez

Boisson also makes two arguments against the government under the Due Process Clause, seeking

a declaration that her passport was revoked unlawfully because it was done with a "lack of fair and

meaningful" pre- and post-revocation procedures.  Compl. ¶¶ 26–27.

The Court first makes clear that a passport is merely "proof of one's citizenship"; it does

not, in and of itself, confer citizenship on a person.  See L. Xia v. Tillerson, 865 F.3d 643, 651–52

(D.C. Cir. 2017).   Hence, the government's administrative revocation of Gonzalez Boisson's

passport does not have any bearing on whether she is actually a citizen.   Id. at 651–52

("[A]dministrative cancellation of a citizen's passport . . . shall 'affect only the document and not

the citizenship status of the person in whose name the document was issued.'" (quoting 8 U.S.C.

§ 1504(a)).  This fact distinguishes her APA claim, which seeks a declaration that she is a U.S.

citizen, from her Due Process Clause claim, which seeks declarations that her passport was

revoked unlawfully.  The question for purposes of Gonzalez Boisson's Due Process Clause claim,

therefore, is whether she has adequately alleged that the government did not provide sufficient

process when it revoked her passport.

The allegations in Gonzalez Boisson's complaint regarding the Due Process Clause are

quite sparse and do not give this Court much to go on.  For a procedural due process claim to

survive a 12(b)(6) motion, a plaintiff must, at a minimum, "identify the process that is due."  Doe

v. District of Columbia, 93 F.3d 861, 870 (D.C. Cir. 1996).  Gonzalez Boisson has arguably done

at least this much with respect to pre-revocation procedures, as her briefing makes a variety of

arguments that what the government did here—send her a revocation letter informing her of the

reasons for the revocation and of her right to a hearing—was insufficient.  She points out that the

government did not alert her to the discrepancy in Denise's statements prior to revoking her passport; did not provide her with a copy of Denise's supposedly inconsistent 2003 statement; and, indeed, did not give her any meaningful opportunity at all to respond before her passport was revoked. See Mem. of P & A in Opp'n to Def.'s Mot. to Dismiss ("Opp'n") [ECF No. 15] at 12–13.

However, the Supreme Court has directly addressed whether the government need afford a person any pre-deprivation procedures before revoking his or her passport, and answered in the negative: "The Constitution's due process guarantees call for no more than . . . a statement of reasons and an opportunity for a prompt postrevocation hearing." Haig v. Agee, 453 U.S. 280, 310 (1981)[5]; see also id. at 309 (noting that "the Government is not required to hold a prerevocation hearing"); Kelso v. U.S. Dep't of State, 13 F. Supp. 2d 1, 4 (D.D.C. 1998) ("[T]he Fifth Amendment's Due Process Clause imposes on the Secretary of State nothing more than a

_____

[5] To be sure, Haig arose in a context where the passport holder had allegedly caused national security harms to the United States by exposing undercover CIA agents in foreign countries, and the Supreme Court took those concerns into account when evaluating what the Due Process Clause required. See Haig, 453 U.S. at 282–84, 309–10. However, there was a serious question in Haig whether the government actually had the authority to promulgate regulations authorizing revocation of a passport on "grounds of national security or foreign policy" under the governing statute. See id. at 298. The Court had to rely on congressional acquiescence and the Executive's Article II authority to uphold the regulation. See id. at 291–304. Here, on the other hand, Congress has explicitly authorized the government to revoke passports "if it appears that such document was illegally, fraudulently, or erroneously obtained." 8 U.S.C. § 1504(a). There is undoubtedly a national security element to this authorization, even if the interests may not be as urgent as the ones at stake in Haig. See Alzokari v. Pompeo, 394 F. Supp. 3d 250, 258–59 (E.D.N.Y. 2019) (analyzing the same regulation and statute at issue in the instant case and concluding that "[t]he relevant Government interests here thus relate not only to maintaining the integrity of Governmental documentation, which plays a role in international travel and proving citizenship, but also to protecting national security, since Department of State officials could have reasonably inferred that, if plaintiff were allowed to keep his passport, he could have continued to use it to smuggle individuals who could jeopardize national security").

In any event, courts have applied Haig not to require a pre-revocation hearing where, as here, Congress has expressly authorized revocation, even where no national security interests are directly implicated. See, e.g., Weinstein v. Albright, 261 F.3d 127, 139 (2d Cir. 2001) (concluding that no pre-revocation hearing was required because "[t]he latitude that should be granted to the Secretary in creating a policy for passport revocation for those certified as being in child support arrears is arguably broader than that given in Haig, as the Secretary in this instance is acting pursuant to a specific delegation of discretionary authority from Congress"); Mathis v. Tillerson, 284 F. Supp. 3d 996, 997 (D. Alaska 2018) (upholding the government's revocation of a person's passport without pre-revocation hearing based on that person being "subject to arrest for felony charges" and noting that "the United States Supreme Court, as well as the Ninth Circuit, clearly has stated that the Secretary does not violate one's due process rights when a passport is revoked for legitimate rational reasons, and the passport bearer has been told of the reasons and has been provided an opportunity for a prompt revocation hearing").

requirement that she inform [plaintiff] why his passport has been revoked and permit him to contest her decision promptly before a hearing officer.").  Here, the government satisfied both of those requirements by providing Gonzalez Boisson with a statement of reasons for the revocation of her passport and giving her an opportunity for a post-revocation hearing.  The government's revocation letter identified 22 C.F.R. § 51.62(a)(2), which states that the government may revoke a passport if it "was illegally, fraudulently, or erroneously obtained," as the legal basis for revocation.  Revocation Letter at 1.  And the government substantiated the allegation that Gonzalez Boisson's passport was obtained illegally, fraudulently, or erroneously by citing specific documents demonstrating that Denise's signed statement in support of Gonzalez Boisson's passport application contained false information.  Id. at 2.

Moreover, the letter informed Gonzalez Boisson that she was entitled to a hearing under 22 C.F.R. §§ 51.70–74.  Id.  Had she requested such a hearing within 60 days of receipt of the revocation letter, the government would have been legally obligated to "make reasonable efforts to hold the hearing within 90 days."  22 C.F.R. § 51.70(c).  The Haig Court did not articulate precisely what it meant by "prompt" hearing, but in these circumstances, where there is no allegation that Gonzalez Boisson imminently needed a U.S. passport, and where the government's interest in ensuring that persons are not fraudulently or falsely obtaining U.S. passports is high, the Court is convinced that "within 90 days" is sufficiently prompt not to run afoul of the Constitution.  Cf. Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230, 243–44 (1988) (concluding that a hearing conducted after 90 days to review the temporary suspension of an indicted bank officer did not violate due process).  Gonzalez Boisson therefore fails to state a claim that the lack of pre-revocation procedures was unconstitutional.

Gonzalez Boisson also argues that some of the procedures prescribed by the regulations for a post-passport-revocation hearing are "unfair," thereby rendering the post-revocation hearing offered to her insufficient and unconstitutional.[6]   Opp'n at 13.   As an initial matter, Gonzalez Boisson did not <u>request</u> a hearing, so any review of the procedures at this point is to some extent abstract.   Another judge in this District, analyzing the same procedures, noted that "[t]here is nothing on the face of the passport regulations that denies due process, and one who claims more process is due has the burden of fairly testing the adequacy of what is provided."   <u>Agee v. Baker</u>, 753 F. Supp. 373, 388 (D.D.C. 1990).   And Gonzalez Boisson has not alleged many facts to support her post-revocation argument: indeed, the only allegations in her complaint regarding that argument are conclusory, stating "that the lack of fair and meaningful post-deprivation procedures for adjudicating the revocation of a United States passport" violates the Due Process Clause. Compl. ¶ 27.   These bare allegations do not meet the threshold requirement that she "identify the process that is due."   <u>Doe</u>, 93 F.3d at 870.

Regardless, on the facts that are presented, the Court concludes that the procedures specified for the post-revocation hearing here do not violate due process.   The relevant standard for evaluating what process is due is the <u>Mathews v. Eldridge</u> three-factor test, in which courts look at (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."   424 U.S. 319, 335 (1976).

---

[6] The Court emphasizes, for clarity, that the regulations referred to here are entirely distinct from the statutes and regulations discussed in the section of this opinion addressing Gonzalez Boisson's APA claim.

The private interest at stake is Gonzalez Boisson's liberty interest in international travel using a U.S. passport.  While this interest is real and significant, both the Supreme Court and the D.C. Circuit have made clear that "international travel is no more than an aspect of liberty that is subject to reasonable government regulation within the bounds of due process," distinguishing inter<u>national</u> travel from inter<u>state</u> travel, which is a "fundamental right subject to a more exacting standard."  <u>Hutchins v. District of Columbia</u>, 188 F.3d 531, 537 (D.C. Cir. 1999); <u>see</u> <u>Haig</u>, 453 U.S. at 307.  On the other hand, the government has a profound interest in preventing passport fraud to ensure that non-citizens cannot travel abroad under the guise of—and with the privileges associated with—U.S. citizenship.  <u>See</u> Reply at 6; <u>see also</u> <u>Haig</u>, 453 U.S. at 293 ("[A] passport is both proof of identity and proof of allegiance to the United States . . . [it is] in a sense a document by which the Government vouches for the bearer and for his conduct.").

As for the second <u>Mathews</u> factor, Gonzalez Boisson does not make any explicit argument in her briefing (and none at all in her complaint) that the hearing procedures would risk an erroneous deprivation of her interest in her passport.  However, she does briefly challenge a number of procedures as "unfair."  She first complains that she has "no right to subpoena witnesses or to conduct discovery" under 22 C.F.R. § 51.71(d).  Opp'n at 13.  But the same subsection <u>does</u> allow her to "testify in person, offer evidence in . . . her own behalf, present witnesses, and make arguments at the hearing," 22 C.F.R. § 51.71(d), and a different provision allows her to submit witness affidavits for those witnesses who can't appear in person, <u>id.</u> § 51.71(f).  Gonzalez Boisson offers no rationale for why, in her case, subpoenaing witnesses or conducting discovery would add much value or reduce the risk of an erroneous deprivation of her interest.

Next, she argues that the hearing would not be "conducted by an impartial arbiter," because an employee from the State Department's Bureau of Consular Affairs serves as the hearing officer.

Opp'n at 13.  But she offers no basis from which the Court could conclude that such an employee would not be an impartial arbiter, nor does she account for the fact that the hearing officer makes only preliminary findings of fact and recommendations, which are then sent (along with the record) to the Deputy Assistant Secretary for Passport Services, who reviews the case again and makes a final decision whether to uphold the revocation, see 22 C.F.R. § 51.74.

Gonzalez Boisson also complains that she cannot contest the revocation "in the United States," but fails to explain why a hearing held at "the appropriate U.S. diplomatic or consular" post would pose more of a risk of error than one held inside the United States.  See Opp'n at 13. Moreover, she ignores the extensive procedural protections that the regulations do provide, such as placing the burden of proof for revocation on the government, 22 C.F.R. § 51.71(h), requiring the government to turn over its evidence to her prior to the hearing, id. § 51.71(d) & (h), and allowing her to retain counsel and submit written briefs to the hearing officer, id. § 51.71(b) & (g). In the absence of a compelling argument by Gonzalez Boisson that these procedures are inadequate, the Court is persuaded that the procedures would adequately protect against an erroneous deprivation of her interest.

To sum up the Mathews analysis, based on the facts alleged in the complaint: while Gonzalez Boisson's liberty interest in international travel is significant, it is outweighed by the government's interest in preventing passport fraud and by the fact that the procedures afforded adequately mitigate the risk of an erroneous deprivation of her interest.  Accordingly, the Court concludes that Gonzalez Boisson has failed to state a claim that the procedures for a post-revocation hearing violate due process.

**Conclusion**

For the foregoing reasons, the Court will grant the government's motion to dismiss Gonzalez Boisson's Due Process Clause claim but will deny the motion as to Gonzalez Boisson's APA claim.  A separate order has been issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>April 28, 2020</u>